**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THERESA HOWARD-HINES, Derivatively on Behalf of Nominal Defendant PACS GROUP, INC., <br><br> Plaintiff, <br><br> v. <br><br> JASON MURRAY, DERICK APT, MARK HANCOCK, MICHELLE LEWIS, JACQUELINE MILLARD, TAYLOR LEAVITT, and EVELYN DILSAVER, <br><br> Defendants, <br><br> and <br><br> PACS GROUP, INC., <br><br> Nominal Defendant. | Case No. 1:25-cv-01343 <br><br> JURY TRIAL DEMANDED |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Plaintiff Theresa Howard-Hines ("Plaintiff"), by and through her undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant PACS Group, Inc. ("PACS Group" or the "Company"), against its Board of Directors (the "Board") and certain of its executive officers seeking to remedy Defendants' (defined below) breaches of fiduciary duties and violations of federal law.  Plaintiff alleges the following based upon personal knowledge as to herself and her own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' publicly available documents, conference call transcripts and announcements made by Defendants, United States Securities and Exchange Commission

("SEC") filings, press releases published by and regarding PACS Group, legal filings, news reports, securities analysts' reports about the Company, filings in the securities class actions captioned *Manchin v. PACS Group, Inc., et al.,* Case No. 1:24-cv-08636-LJL (S.D.N.Y.) (the "*Manchin* Action") and *New Orleans Employees Retirement System v. PACS Group, Inc.*, *et al.*, Case No. 1:24-cv-08882-LJL (S.D.N.Y.) (the "*New Orleans* Action") (collectively referred to herein as the "Securities Class Actions"),[1] and other publicly available information.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought by Plaintiff on behalf of PACS Group against certain of its officers and members of the Company's Board (the "Individual Defendants")[2] for breaches of their fiduciary duties from at least April 11, 2024 through November 5, 2024, inclusive (the "Relevant Period"), and violations of federal securities laws, as set forth below.

2.      Founded in 2013, PACS Group is a holding company that invests in post-acute healthcare facilities, professionals, and ancillary services. Through its independent subsidiaries, PACS Group operates over 200 post-acute care facilities across nine states, serving over 22,000 patients daily.

3.      During the Relevant Period, the Company conducted two separate public offerings of its common stock. On April 12, 2024, PACS Group filed a prospectus on a Form 424B4 with the SEC, registering its initial public offering ("IPO") of 21,428,572 shares of the Company's

---

[1] The *New Orleans* Action was consolidated into the *Manchin* Action on January 7, 2025. *See Manchin* Action, ECF No. 16.

[2] The Individual Defendants are Jason Murray ("Murray"), Derick Apt ("Apt"), Mark Hancock ("Hancock"), Michelle Lewis ("Lewis"), Jacqueline Millard ("Millard"), Taylor Leavitt ("Leavitt"), and Evelyn Dilsaver ("Dilsaver"). "Defendants" means PACS Group and the Individual Defendants.

common stock at a price of $21.00 per share (the "IPO Prospectus").

4.    The IPO closed on April 15, 2024, and resulted in net proceeds of approximately $450 million. Thereafter, PACS Group common stock began trading on the New York Stock Exchange ("NYSE") under the symbol "PACS."

5.    On September 6, 2024, the Company filed a prospectus on a Form 424B4 with the SEC to register its second public offering (the "SPO") of 16,551,724 shares of its common stock, which included (a) 2,777,778 shares of its common stock sold by the Company and (b) 13,773,946 shares of common stock sold by certain selling stockholders (the "SPO Prospectus"). The SPO closed on September 9, 2024, and resulted in net proceeds of approximately $101 million for the Company and $589 million for the selling stockholders.

6.    Unbeknownst to investors, however, PACS Group's historical revenue and profit growth represented prior to and at the time of the IPO were artificially inflated due to the Company's systemic and unlawful practices. As would later be revealed, the Company engaged in multi-year, nationwide schemes to maximize per-patient revenue by, among other ways, abusing COVID-related emergency waivers to obtain improper Medicare benefits, improperly billing certain therapies to Medicare Part B, even when those therapies weren't applicable to patients, placing unlicensed individuals in administrator positions, and miscategorizing employee positions in order to circumvent minimum staffing requirements.

7.    Throughout the Relevant Period, the Individual Defendants made materially false and misleading positive statements regarding the Company's business structure, revenue growth and profitability, and regulatory compliance, among other things, while obscuring its improper practices.

8.    The truth began to emerge on November 4, 2024, when *Hindenburg Research*

published a report titled "PACS Group: How To Become A Billionaire In the Skilled Nursing Industry By Systemically Scamming Taxpayers."[3] The report, which was based on a five-month investigation that included interviews with eighteen former PACS Group employees and competitors, and an analysis of more than 900 PACS Group facility cost reports, revealed that PACs Group "abused a COVID-era waiver, inappropriately accessing skilled care Medicare benefits for thousands of patients across its national portfolio of facilities, according to our investigation." The report revealed that PACS Group's submission of these false claims under Medicare drove more than 100% of PAC Group's operating and net income between 2020 and 2023, which ultimately enabled PACS Group to go public in 2024 with the "illusion of legitimate growth and profitability." The report contained further allegations against PACS Group, including, among others:

- Following the waiver scheme, PACS' Medicare skilled care revenue declined sharply in 2H 2023. But it rebounded in 1H 2024, according to PACS' financial statements. Former employees described a "new trick" to get back to "COVID level profitability" involving billing thousands of unnecessary respiratory and sensory integration therapies to Medicare Part B regardless of clinical need or outcomes. . . .

- Former employees also detailed another scheme whereby PACS attempts to fool regulators by "renting" licenses from third parties to "hang" on buildings. It then either employs unlicensed administrators or has administrators manage multiple buildings in excess of state mandated limits. . . .

- A former manager also detailed a documentation practice whereby PACS would retroactively add fake RN hours "across the board" in another apparent scheme to meet minimum staffing requirements, boost star ratings, and avoid costly penalties.

9.     On this news, the Company's stock price fell $11.93 per share, or approximately

---

[3] Hindenburg Research, *PACS Group: How To Become A Billionaire In the Skilled Nursing Industry By Systemically Scamming Taxpayers* (Nov. 4, 2024), https://hindenburgresearch.com/pacs/.

28%, to close at $31.01 per share on November 4, 2024.

10.    Then, on November 6, 2024, the truth fully emerged when PACS Group issued a press release announcing that it was postponing the filing of its third quarter 2024 earnings release. The press release also revealed that PACS Group "received civil investigative demands from the federal government regarding the Company's reimbursement and referral practices that may or may not be related to this week's third-party report."

11.    On this news, the Company's stock price fell $11.45 per share, or approximately 39%, to close at $18.09 per share on November 6, 2024.

12.    As set forth herein, the Individual Defendants breached their fiduciary duties by issuing, causing the issuance of, and/or failing to correct the materially false and/or misleading statements and omissions of material fact to the investing public.  Specifically, the Individual Defendants failed to disclose to investors that: (a) PACS Group engaged in a scheme to submit false Medicare claims; (b) these false Medicare claims drove more than 100% of the Company's operating and net income between 2020 and 2023; (c) PACS Group engaged in a scheme to bill thousands of unnecessary respiratory and sensory therapies to Medicare recipients; (d) PACS Group engaged in a scheme to falsify documentation related to licensure and staffing at its facilities; and (e) as a result of the foregoing, the Company's public statements regarding its business, operations, financials, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

13.    As a result of the foregoing, the Securities Class Actions were filed against the Company and Defendants Murray, Apt, Hancock, Millard, Leavitt, and Dilsaver in the United States District Court for the Southern District of New York.

14.    As a direct and proximate result of the Individual Defendants' misconduct, the Company has incurred significant financial losses, including the cost of defending and paying class-wide damages in the Securities Class Actions, costs associated with responding to civil investigative demands from the federal government, as well as additional losses, including reputational harm and loss of goodwill.

15.    Moreover, in light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the Individual Defendants' liability in this derivative action and Defendants' liability in the Securities Class Actions, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of PACS Group's Board cannot consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company with the requisite level of disinterestedness and independence. Accordingly, Plaintiff did not make a demand on the Board because, as further detailed herein, demand would be a futile and useless act.

## JURISDICTION AND VENUE

16.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. § 78(j)) and Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder by the SEC, Section 20(a) of the Exchange Act (15 U.S.C. § 78t(a)), Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)), and Section 11(f) of the Securities Act of 1933 (the "Securities Act") (15 U.S.C. § 77k(f)(1)).

17.    Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act and Securities Act.

18.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

19.    Additionally, diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiff and Defendants are citizens of different states, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interests and costs.

20.    This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

21.    In connection with the acts, conduct and other wrongs complained of herein, the Individual Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

22.    Venue is proper in this District pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. § 1391 because Defendants have conducted business in this District, a substantial portion of the acts and omissions alleged herein, including the dissemination of materially false and misleading information, occurred in this District, and the Securities Class Actions are pending in this District.

**PARTIES**

*Plaintiff*

23.    Plaintiff is, and has been at all relevant times, a continuous shareholder of PACS Group. Plaintiff is a citizen of Washington, D.C.

*Nominal Defendant*

24.    Nominal Defendant PACS Group is a Delaware corporation with its principal executive offices located at 262 N. University Avenue, Farmington, Utah 84025. PACS Group's

common stock trades on the NYSE under the ticker symbol "PACS."

***Individual Defendants***

25.     Defendant Murray is a co-founder of the Company and has served as Chief Executive Officer ("CEO") of the Company since January 2013 and as Chairman of the Board since January 2024. According to the SPO Prospectus, Defendants Murray and Hancock collectively own approximately 70.4% of the voting power of PACS Group's common stock. Upon information and belief, Defendant Murray is a citizen of Utah.

26.     Defendant Apt has served as Chief Financial Officer ("CFO") of the Company since January 2024. Apt previously served as Executive Vice President, Chief Investment Officer, and Treasurer of the Company from January 2023 until January 2024, and as Executive Vice President of Corporate Finance and Treasurer of the Company from April 2018 until January 2023. Upon information and belief, Defendant Apt is a citizen of Utah.

27.     Defendant Hancock is a co-founder of the Company and has served as Executive Vice Chairman of the Board since January 2024. Hancock previously served as CFO and as a director of the Company from January 2013 until January 2024. According to the SPO Prospectus, Defendants Murray and Hancock collectively own approximately 70.4% of the voting power of PACS Group's common stock. Upon information and belief, Defendant Hancock is a citizen of Utah.

28.     Defendant Lewis has served as Chief Accounting Officer of the Company since January 2023. Between July 2018 and January 2023, Lewis served in various leadership roles at the Company. Upon information and belief, Defendant Lewis is a citizen of Utah.

29.     Defendant Millard has served as a director of the Company since July 2023. Millard also serves as Chair of the Company's Audit Committee and as a member of the Company's

Compensation Committee and Nominating and Corporate Governance Committee. Upon information and belief, Defendant Millard is a citizen of Utah.

30.     Defendant Leavitt has served as a director of the Company since July 2023. Leavitt also serves as Lead Independent Director of the Board, Chair of the Company's Compensation Committee, and a member of the Company's Audit Committee and Nominating and Corporate Governance Committee. Upon information and belief, Defendant Leavitt is a citizen of Utah.

31.     Defendant Dilsaver has served as a director of the Company since March 2024. Dilsaver also serves as Chair of the Company's Nominating and Corporate Governance Committee and as a member of the Company's Audit Committee and Compensation Committee. Upon information and belief, Defendant Dilsaver is a citizen of Arizona.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

32.     By reason of their positions as officers and/or directors of PACS Group, and because of their ability to control the business and corporate affairs of PACS Group, the Individual Defendants owed PACS Group and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage PACS Group in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of PACS Group and its shareholders.

33.     Each director and officer of the Company owes to PACS Group and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

34.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of PACS Group, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

35.     To discharge their duties, the officers and directors of PACS Group were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

36.     Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of PACS Group, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

37.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

38.    To discharge their duties, the officers and directors of PACS Group were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of PACS Group were required to, among other things:

(i)    Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of New York and the United States, and pursuant to PACS Group's own Code of Business Conduct and Ethics (the "Code of Conduct");

(ii)    Conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(iii)    Remain informed as to how PACS Group conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(iv)    Establish and maintain systematic and accurate records and reports of the business and internal affairs of PACS Group and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(v)    Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that PACS Group's operations would comply with all applicable laws and PACS Group's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(vi)    Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(vii)    Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(viii)    Examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

39.    Each of the Individual Defendants further owed to PACS Group and the shareholders the duty of loyalty requiring that each favor PACS Group's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

40.    At all times relevant hereto, the Individual Defendants were the agents of each other and of PACS Group and were at all times acting within the course and scope of such agency.

41.    Because of their advisory, executive, managerial, and directorial positions with PACS Group, each of the Individual Defendants had access to adverse, non-public information about the Company.

42.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by PACS Group.

### **PACS GROUP'S CODE OF CONDUCT**

43.    The Company's Code of Conduct begins by stating that the Company adopted the Code of Conduct to encourage:

- Honest and ethical conduct, including fair dealing and the ethical handling of actual or apparent conflicts of interest;

- Full, fair, accurate, timely and understandable disclosures;

- Compliance with applicable laws and governmental rules and regulations;

- Prompt internal reporting of any violations of law or the Code;

- Accountability for adherence to the Code, including fair process by which to determine violations;

- The protection of the Company's legitimate business interests, including its assets and corporate opportunities; and

- Confidentiality of information entrusted to directors, officers and employees by the Company and its customers.

44.     The Code of Conduct states that it applies to all directors, officers, and employees of the Company, its subsidiaries, and its controlled affiliates.

45.     Under a section titled "Conflicts of Interest," the Code of Conduct states, in relevant part:

A conflict of interest occurs when the private interests of a Covered Party interfere, or appear to interfere, with the interests of the Company as a whole.

For example, a conflict of interest can arise when a Covered Party takes actions or has personal interests that make it difficult to perform his or her Company duties objectively and effectively. A conflict of interest may also arise when a Covered Party, or a member of his or her immediate family, receives improper personal benefits as a result of his or her position at the Company.

Conflicts of interest can also occur indirectly. For example, a conflict of interest may arise when a Covered Party is also an executive officer, a major shareholder or has a material interest in an organization doing business with the Company.

Each Covered Party has an obligation to conduct the Company's business in an honest and ethical manner, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships. Any situation that involves, or may reasonably be expected to involve, a conflict of interest with the Company, should be disclosed promptly to the Company's Chief Legal Officer.

46.     Under a section titled "Disclosures," the Code of Conduct states:

The information in the Company's public communications, including all reports and documents filed with or submitted to the SEC, must be full, fair, accurate, timely and understandable.

To ensure the Company meets this standard, all Covered Parties (to the extent they are involved in the Company's disclosure process) are required to maintain familiarity with the disclosure requirements, processes and procedures applicable to the Company commensurate with their duties. Covered Parties are prohibited from knowingly misrepresenting, omitting or causing others to misrepresent or omit, material facts about the Company to others, including the Company's independent auditors, governmental regulators and self-regulatory organizations.

47.    Under a section titled "Compliance with Laws, Rules and Regulations," the Code

of Conduct states:

The Company is obligated to comply with all applicable laws, rules and regulations. It is the personal responsibility of each Covered Party to adhere to the standards and restrictions imposed by these laws, rules and regulations in the performance of his or her duties for the Company.

Trading on inside information is a violation of federal securities law. Covered Parties in possession of material non-public information about the Company or companies with whom we do business must abstain from trading or advising others to trade in the respective company's securities from the time that they obtain such inside information until adequate public disclosure of the information. Material information is information of such importance that it can be expected to affect the judgment of investors as to whether or not to buy, sell, or hold the securities in question. To use non-public information for personal financial benefit or to "tip" others, including family members, who might make an investment decision based on this information is not only unethical but also illegal.

The Chief Executive Officer, Chief Financial Officer and Chief Accounting Officer or Controller (or persons performing similar functions) of the Company are also required to promote compliance by all employees with the Code and to abide by Company standards, policies and procedures.

48.    In a section titled "Reporting, Accountability and Enforcement," the Code of

Conduct states, in relevant part

The Company promotes ethical behavior at all times and encourages Covered Parties to talk to supervisors, managers and other appropriate personnel, including officers, the Chief Legal Officer, and the Board or the relevant committee thereof, when in doubt about the best course of action in a particular situation.

Covered Parties should promptly report suspected violations of laws, rules, regulations or the Code or any other unethical behavior by any director, officer, employee or anyone purporting to be acting on the Company's behalf to appropriate personnel, including officers, the Chief Legal Officer and the Board or the relevant committee thereof. Reports may be made anonymously. If requested, confidentiality will be maintained, subject to applicable law, regulations and legal proceedings.

The Board, the Audit Committee of the Board or Chief Legal Officer shall investigate and determine, or shall designate appropriate persons to investigate and determine, the legitimacy of such reports. The Audit Committee or Chief Legal Officer will then determine the appropriate disciplinary action. Such disciplinary action includes, but is not limited to, reprimand, termination with cause, and possible civil and criminal prosecution.

## PACS GROUP'S AUDIT COMMITTEE CHARTER

49.     PACS Group's Audit Committee Charter states that the purpose of the Audit Committee is to "assist the Board in its oversight of: (i) the integrity of the Company's financial statements; (ii) the Company's compliance with legal and regulatory requirements; (iii) the independent auditor's qualifications and independence; and (iv) the performance of the Company's internal audit function and independent auditor."

50.     In a section titled "Duties and Responsibilities," the Audit Committee Charter states that the Audit Committee has the following duties and responsibilities:

*Interaction with the Independent Auditor*

1.     *Appointment and Oversight*. The Committee is directly responsible for the appointment, compensation, retention and oversight of the work of the independent auditor and any other registered public accounting firm engaged for the purpose of preparing or issuing an audit report or related work or performing other audit, review or attest services for the Company (including resolution of any disagreements between Company management and the independent auditor or other registered public accounting firm regarding financial reporting), and the independent auditor and each such other registered public accounting firm must report directly to the Committee.

2.     *Preapproval of Audit and Non-Audit Services*. The Committee must pre-approve any audit and non-audit service provided to the Company by the independent auditor, unless the engagement is entered into pursuant to

appropriate preapproval policies established by the Committee or if such service falls within available exceptions under SEC rules. Other than with respect to the annual audit of the Company's consolidated financial statements, the Chair of the Committee is authorized to pre-approve other audit services and non-audit services provided to the Company by the independent auditor on behalf of the Committee and each such pre-approval decision will be presented to the full Committee at its next scheduled meeting.

3.    *Annual Report on Independence and Quality Contro*l. The Committee must, at least annually, obtain and review a report from the independent auditor describing (a) the auditing firm's internal quality-control procedures; (b) any material issues raised by the most recent internal quality-control review or peer review of the auditing firm, or by any inquiry or investigation by governmental or professional authorities within the preceding five years relating to any independent audit conducted by the auditing firm, and any steps taken to deal with any such issues; and (c) all relationships and services between the independent auditor and the Company in order to assess the independent auditors' independence.

*Annual Financial Statements and Annual Audit*

4.    *Audit Problems.* The Committee must discuss with the independent auditor any audit problems or difficulties and management's response.

5.    *Form 10-K Review*. The Committee must review and discuss with management and the independent auditor the annual audited financial statements, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" and recommend to the Board whether the audited financial statements should be included in the Company's Form 10-K.

6.    *Audit Committee Report*. The Committee must provide the Company with the report of the Committee with respect to the audited financial statements for inclusion in each of the Company's annual proxy statements.

*Quarterly Financial Statements*

7.    *Form 10-Q Review*. The Committee must review and discuss with management and the independent auditor the Company's quarterly financial statements, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

*Other Duties and Responsibilities*

8.      *Review of Earnings Releases*. The Committee must discuss the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies.

9.      *Risk Assessment and Risk Management.* The Committee must discuss the Company's policies with respect to risk assessment and risk management and oversee the management of the Company's financial risks and information technology risks, including cybersecurity and data privacy risks. The Committee must discuss with management the steps management has taken to monitor and control these risks.

10.     *Hiring of Independent Auditor Employees.* The Committee must set clear hiring policies for employees or former employees of the Company's independent auditor.

11.     *Complaint Procedures.* The Committee has approved the procedures set forth in the Company's Policies and Procedures for Complaints Regarding Accounting, Internal Accounting Controls, Fraud or Auditing Matters ("Whistleblower Policy") for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and for the confidential and anonymous submission by Company employees of concerns regarding questionable accounting or auditing matters.

12.     *Review of Internal Control Over Financial Reporting.* The Committee must review and discuss with management and the independent auditor the adequacy of the Company's internal control over financial reporting ("ICFR") and any steps management has taken to address material weaknesses in ICFR.

13.     *Review of Related Person Transactions*. The Committee will periodically review the Company's policies and procedures for reviewing and approving "related person transactions" as defined by Item 404 of Regulation S-K and approve or recommend to the Board any changes to such policies and procedures. In accordance with the Company's Related Person Transaction Policy and Procedures and NYSE rules, the Committee will review and, if appropriate, approve related person transactions and oversee such transactions on an ongoing basis.

14.     *Review of Code of Business Conduct and Ethics.* The Committee must periodically consider and discuss with management and the independent auditor the Company's Code of Business Conduct and Ethics (the "Code") and the procedures in place to enforce the Code. The Committee must also consider and discuss and, as appropriate, grant requested waivers from the Code brought to the attention of the Committee; provided that the Committee may defer any decision with respect to any waiver to the Board.

15.    *Reports to the Board of Directors.* The Committee must report regularly to the Board regarding the activities of the Committee.

16.    *Committee Self-Evaluation.* The Committee must at least annually perform an evaluation of the performance of the Committee.

17.    *Review of this Charter.* The Committee must periodically review and reassess this Charter and submit any recommended changes to the Board for its consideration.

## SUBSTANTIVE ALLEGATIONS

*Background*

51.    Founded in 2013, PACS Group is a holding company that invests in post-acute healthcare facilities, professionals, and ancillary services. Through its independent subsidiaries, PACS Group operates over 200 post-acute care facilities across nine states, serving over 22,000 patients daily

52.    According to the Company's public filings, the post-acute care ecosystem serves individuals who need additional help recuperating from acute conditions, illnesses, or serious medical procedures after they have been discharged from the hospital. Post-acute care facilities range from higher acuity, higher-cost settings, such as long-term acute care hospitals and inpatient rehabilitation facilities, to lower acuity, lower-cost settings, such as assisted living facilities, and home health. Skilled nursing facilities ("SNFs"), which provide cost efficient facility-based care to patients that have been discharged from hospitals but still require twenty-four-hour in-patient services, are one of the main types of post-acute care facilities.

53.    Since the start of the COVID-19 pandemic in 2020, the Company has reported strong revenue and profit growth, positioning itself as one of the largest businesses in the SNF sector in the United States. Indeed, the Company reported total revenue of $2.4 billion for 2022 and $3.1 billion for 2023.

54.     As acknowledged by PACS Group in its public filings, a substantial portion of the Company's revenue is generated from payments from third-party payors, namely from the Medicare and Medicaid programs. Specifically, Medicare and Medicaid accounted for 47.6% and 30.2% of the Company's total revenue for 2022, respectively, and 38.6% and 37.6% of the Company's routine revenue for 2023, respectively. This is due, in part, to the fact that the Company receives higher reimbursement rates from Medicare for treating beneficiaries in SNFs who require a higher level of skilled care.

55.     However, unbeknownst to investors, the Company's historical revenue and profit growth that it represented to investors were artificially inflated due to the Company's systemic and unlawful practices.

56.     Despite this, the Company used the momentum from its artificially inflated revenue and profit growth to initiate the IPO. On April 12, 2024, PACS Group undertook its IPO of 21,428,572 shares of the Company's common stock at a price of $21.00 per share, resulting in net proceeds of approximately $450 million and the trading of the Company's common stock on the NYSE under the symbol "PACS."

57.     Subsequently, on September 6, 2024, the Company undertook the SPO, wherein PACS Group issued 2,777,778 shares of its common stock at $36.25 per share for proceeds of $100.7 million, and sold 16,256,704 shares of its common stock at $36.25 per share for proceeds of $589.3 million.

***Individual Defendants' Materially False and Misleading Statements***

58.     Throughout the Relevant Period, the Individual Defendants made materially false and misleading positive statements regarding the Company's financial and operational results,

including statements about the Company's structure, business model, revenue, growth, and regulatory compliance.

59.     In connection with its IPO, on March 13, 2024, the Company filed a registration statement on a Form S-1 with the SEC. After filing two prior amendments, PACS Group filed a third amendment to the registration statement on a Form S-1MEF with the SEC on April 10, 2024 (the "IPO Registration Statement"). Subsequently, the Company filed the IPO Prospectus on a Form 424B4 with the SEC on April 12, 2024, which was a part of the IPO Registration Statement (the IPO Registration Statement and the IPO Prospectus are hereinafter collectively referred to as the "IPO Materials").

60.     The IPO Materials contained numerous materially false and misleading facts and/or omitted to state facts necessary to make the statements not misleading.

61.     For instance, the IPO Prospectus stated that the Company's profitability and success was due, in part, to its business model, stating:

> Our business model, like those of some other for-profit operators, is based in part on attracting higher-acuity patients whom we believe provide us more opportunity to be profitable due to the higher level of services they need and accordingly higher reimbursement rates, and over time our overall patient mix has consistently shifted to higher-acuity and higher-resource utilization patients in most facilities we operate.

62.     The IPO Prospectus also included statements about the factors that purportedly led to the Company's growth, stating, in relevant part:

> Our significant historical growth has been primarily driven by implementing our expertise in acquiring underperforming long-term custodial care SNFs and converting them into higher acuity, high value-add short-term transitional care SNFs.

63.     The IPO Prospectus also noted that the Company is subject to a number of regulations, which if they do not follow, would have a significant effect on its business:

We operate in a highly regulated industry with stringent regulatory compliance obligations, which requires robust regulatory compliance operations. ***Failure to operate in compliance with applicable laws and regulations could require significant expenditures and result in regulatory deficiencies and other regulatory penalties***. PACS Services functions to support our regulatory compliance obligations across our organization, including through controlled billing and cost reporting practices and legal, risk management, and compliance support.

(Emphasis added).

64.    The IPO Prospectus also touted the Company's compliance efforts, stating, in relevant part:

***Robust culture of compliance.*** We focus on instilling a unified, cohesive culture of innovation and compliance that we believe provides consistency in our results and confidence in our facilities as an attractive care option for patients. Our rigorous approach to billing integrity, our independent internal compliance function, and our regular facility billing audits are intended to provide a foundation of trust and collaboration that makes us a natural choice for payors. . . .

We believe our technology and internally developed dashboards help to facilitate better patient care, risk management, regulatory compliance, staffing, and resource allocation. We have designed our technology to be easily integrated into new facilities and allow us to scale quickly and efficiently. . . .

We also believe our size and scale has provided us with the ability to negotiate favorable contracts with managed care and other payor sources, the ability to navigate stringent regulatory compliance obligations and withstand potential reimbursement and regulatory industry dynamics, and the ability to leverage real estate value for liquidity and growth.

65.    Doubling down on its "robust culture of compliance," the IPO Prospectus highlighted the steps PACS Group was taking to meet its compliance obligations, stating, in relevant part:

We have internal compliance professionals and invest in other resources to help us comply with various requirements of federal and private healthcare programs. Our compliance program includes, among other things, (1) policies and procedures that take into account applicable laws, regulations, sub-regulatory guidance and industry practices and customs that govern the clinical, reimbursement and operational aspects of our operating subsidiaries; (2) training about our compliance process for employees throughout our organization, our directors and officers, and

training about Medicare and Medicaid laws, fraud and abuse prevention, clinical standards and practices, and claim submission and reimbursement policies and procedures for appropriate employees; and (3) internal controls that monitor, among other things, the accuracy of claims, reimbursement submissions, cost reports and source documents, provision of patient care, services, and supplies as required by applicable standards and laws, accuracy of clinical assessment and treatment documentation, and implementation of judicial and regulatory requirements (i.e., background checks, licensing and training).

While we have not experienced any material compliance issues to date, from time to time, our systems and internal controls highlight potential compliance issues, which we investigate as they arise. We similarly investigate concerns that are reported to us by employees or other persons. When errors or compliance failures are identified, we seek to rectify them as appropriate.

66.    Under the "Risk Factors" section of the IPO Prospectus, the Company identified

several "potential" risks to the Company's business and the industry, including:

We depend upon reimbursement from third-party payors, and our revenue, financial condition and results of operations could be negatively impacted by any changes in the acuity mix of patients in our facilities as well as changes in payor mix and payment methodologies and new cost containment initiatives by third-party payors. . . .

We face numerous risks related to expiration of the COVID-19 public health emergency (PHE) expiration and surrounding wind down and uncertainty, which could, individually or in the aggregate, have a material adverse effect on our business, financial condition, liquidity, results of operations and prospects. . . .

We review and audit the care delivery, recordkeeping and billing processes of our operating subsidiaries. These reviews from time to time detect instances of noncompliance that we attempt to correct, which in some instances requires reduced or repayment of billed amounts or other costs. . . .

If we do not achieve or maintain competitive quality of care ratings from CMS or private organizations engaged in similar rating activities, our business may be negatively affected.

We rely on payments from third-party payors, including Medicare, Medicaid and other governmental healthcare programs and private insurance organizations. If coverage or reimbursement for services are changed, reduced or eliminated, including through cost-containment efforts, spending requirements are changed, data reporting, measurement and evaluation standards are enhanced and changed, our operations, revenue and profitability could be materially and adversely affected.

67.    In addition to the statements concerning the Company's business, compliance requirements, and risk factors, the IPO Prospectus also highlighted the Company's financial results, stating, in relevant part:

> For the year ended December 31, 2023, we generated total revenue of $3.1 billion, representing a CAGR of 63.3% over the last three years. A substantial portion of our revenue is generated from payments from third-party payors, including Medicare and Medicaid, which represent our largest sources of revenue and accounted for 38.6% and 37.6% of our routine revenue for the year ended December 31, 2023, respectively. For the year ended December 31, 2022, we generated revenue of $2.4 billion, and Medicare and Medicaid accounted for 47.6% and 30.2% of our total revenue, respectively. For the year ended December 31, 2023, we generated total net income of $112.9 million, total operating expense of $2.9 billion and Adjusted EBITDA of $237.5 million, representing a CAGR of 53.4%, 63.7%, and 51.1%, respectively, over the last three years. For the year ended December 31, 2022, our total operating expenses were $2.2 billion, and we generated net income of $150.5 million and Adjusted EBITDA of $255.5 million.

68.    Additionally, the IPO Prospectus highlighted the Company's revenue from its SNFs:

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2023 | 2022 | 2021 |
| | (Dollars in thousands) | | |
| Key Skilled Services Metrics | | | |
| Skilled nursing services revenue | $  3,092,577 | $  2,391,309 | $  1,133,103 |
| Skilled mix by revenue | 55.1 % | 64.1 % | 57.8 % |
| Skilled mix by nursing patient days | 32.4 % | 40.7 % | 34.5 % |
| Occupancy for skilled nursing services: | | | |
| Available patient days | 7,457,345 | 5,719,689 | 3,106,602 |
| Actual patient days | 6,775,063 | 5,139,736 | 2,681,927 |
| Occupancy rate (operational beds) | 90.9 % | 89.9 % | 86.3 % |
| Number of facilities at period end | 203 | 150 | 138 |
| Number of operational beds at period end | 22,950 | 16,345 | 14,841 |
| Non-GAAP Financial Measures | | | |
| *Performance Measures* | | | |
| EBITDA[1] | $  232,860 | $  254,894 | $  93,857 |
| Adjusted EBITDA[1] | $  237,486 | $  255,516 | $  104,073 |
| *Valuation Measure* | | | |
| Adjusted EBITDAR[1] | $  454,197 | | |

69.    The IPO Prospectus explained how both skilled nursing services revenue and shared mix revenue are calculated, stating:

- <u>Skilled nursing services revenue</u> — Skilled nursing services revenue reflects the portion of patient and resident service revenue generated from all patients in skilled nursing facilities, excluding revenue generated from

our assisted and independent living services.

- <u>Skilled mix</u> — We measure both revenue and nursing patient days by payor. Medicare and managed care patients, whom we refer to as high acuity patients, typically require a higher level of skilled nursing care. As a result, Medicare and managed care reimbursement rates are typically higher than those from other payors. In most states, Medicaid reimbursement rates are generally the lowest of all payor types.

70.    The IPO Prospectus also reported PACS Group's purported employee, staffing, and licensure qualifications of its registered nurses ("RNs"), licensed practical nurses ("LPNs"), and certified nursing assistants ("CNAs"), stating:

As of December 31, 2023, we had 32,433 employees working across 208 post-acute care facilities in 9 states and at our corporate headquarters in Farmington, Utah. Of our 32,433 employees, 19,321 are clinicians, including approximately 2,244 RNs including DONs, approximately 5,355 LPNs, and approximately 11,722 CNAs. Approximately 13,112 of our employees work in non-clinical functions and administrative / support functions, including 14 RVPs, and 150 facility administrators, 143 clinical and compliance support, 72 information technology support, and approximately 12,733 additional administrative and support staff. We also employ a dedicated team specifically focused on ensuring smooth functioning and support for our point-of-care including the clinical and compliance support, information technology support above. Additionally, 3,478 of our employees were represented by unions under collective bargaining agreements as of December 31, 2023.

71.    The IPO Prospectus also noted that the Company's facilities and professionals are subject to certain licensure and certification requirements, and noted the "potential" risks to the Company's business if these requirements were not met:

***Licensure and Certification***

Our facilities and healthcare professionals are subject to various federal, state, and local licensure and certification requirements in connection with our provision of healthcare services. Certain states in which we operate have certificate of need or similar programs regulating the establishment or expansion of healthcare facilities. The initial and continued licensure of our facilities and certification to participate in government healthcare programs depends upon many factors including various state licensure regulations relating to quality of care, environment of care, equipment, services, minimum staffing requirements, staff training, personnel, and the existence of adequate policies, procedures, and controls. In addition to facility

licensure requirements, states also impose licensing requirements on the healthcare professionals who provide services at our facilities. States may impose restrictions on, or revoke, licenses of healthcare providers for, among other things, improper clinical conduct and delegation of such services, patient mistreatment, ethical violations and substance abuse, or aiding and abetting the unlicensed practice of medicine. . . .

If our independent operating subsidiaries fail to comply with these directives or otherwise fail to comply substantially with licensure and certification laws, rules and regulations, the facility could lose its certification as a Medicare or Medicaid provider, or lose its license permitting operation in the State.

72.    On May 13, 2024, the Company issued a press release announcing its financial results for the first quarter of 2024 (the "1Q24 Earnings Release"). In the 1Q24 Earnings Release, the Company announced that the Company had consolidated GAAP revenue of $934.7 million for the quarter, which was an increase of 31.9% from the same quarter in 2023. The 1Q24 Earnings Release also stated that the Company was providing guidance for revenue for the full year 2024 between $3.65 billion to $3.75 billion.

73.    The 1Q24 Earnings Release also highlighted the Company's work within the Medicare and Medicaid programs and the Company's SNF business:

- Average Medicare and Medicaid daily rates increased 9.5% and 3.5%, respectively, for the second quarter of 2024, as compared to the same quarter of the prior year.

- In the second quarter of 2024 the Company added 2 operating facilities, including 167 skilled nursing beds, respectively.

74.    Additionally, in the 1Q24 Earnings Release, Defendant Murray was quoted as stating, in relevant part, "[w]e had a very strong quarter, highlighted by 158 of our facilities having a 4 or 5 star CMS Quality Measures rating. We believe this is a key driver of our revenue growth year over year of 31.9% or $226.3 million on a same quarter basis."

75.    That same day, the Company filed its quarterly report for the period ended March 31, 2024 on a Form 10-Q with the SEC (the "1Q24 10-Q"). The 1Q24 10-Q contained the same

financial information as the 1Q24 Earnings Release. *See* ¶ 72. Additionally, the 1Q24 10-Q

highlighted the Company's patient and service revenue and skilled nursing services revenue for

the quarter, stating, in relevant part:

> <u>Patient and resident service revenue</u> - Patient and resident service revenue increased by $226.5 million to $934.3 million for the three months ended March 31, 2024, a 32.0% increase compared to the three months ended March 31, 2023. For the three months ended March 31, 2024 and 2023, skilled nursing services revenue represented more than 99.0% of patient and resident service revenue.
>
> Skilled nursing services revenue increased by 31.4%, or $221.9 million, to $927.5 million for the three months ended March 31, 2024, compared to the three months ended March 31, 2023. This change was driven by an increase in operational beds of 5,194 from March 31, 2023 to March 31, 2024 leading to a 35.3% increase in patient days year-over-year. Additionally we experienced a consistent occupancy rate across all facilities of 91.1% for the three months ended March 31, 2024, compared to 91.8% for the three months ended March 31, 2023, following continued execution on our business model.

76.    The 1Q24 10-Q also reported that revenue from the Medicaid and Medicare

programs accounted for 38.8% and 35.7% of the Company's condensed combined/consolidated

net patient and resident revenue for the quarter, respectively.

77.    Furthermore, the 1Q24 10-Q contained substantially the same false and misleading

statements regarding the Company's risks, compliance measures, and license and certification

requirements as the IPO Prospectus. *See* ¶¶ 64-66, 71.

78.    The 1Q24 10-Q was signed by Defendants Murray and Apt. The 1Q24 10-Q was

also accompanied by certifications made by Defendants Murray and Apt pursuant to Sections 13a-

15(e) and 15d-15(e) of the Exchange Act and Section 302 of the Sarbanes-Oxley Act of 2002 (the

"SOX Certifications"). In the SOX Certifications, Defendants Murray and Apt attested to the

accuracy of the 1Q24 10-Q.

79.    On May 14, 2024, the Company held an earnings call for investors and analysts to

discuss its financial results for the first quarter of 2024 (the "1Q24 Earnings Call"). During the

1Q24 Earnings Call, Defendant Murray highlighted the Company's overall business model, stating, in relevant part:

> Clinically, our teams continue to excel in caring for their residents. This is illustrated by 158 of our skilled nursing facilities having achieved a four or five star CMS quality measure rating. Our facilities and teams are always committed to working towards a five star quality rating. This kind of effort is the most important factor in our financial strength and revenue growth year over year of 32% or $226.5 million.

80.    Defendant Murray went on to tout the Company's revenue growth during the 1Q24 Earnings Call, attributing the growth, in part, to the increase in Medicare and Medicaid rates:

> Our revenue was driven higher by several factors when compared with the same quarter last year. In addition to increasing occupancy, we also saw revenue per patient day increases. For example, our average daily Medicare rates increased by 11% for the three months ended March 31st, 2024, compared to the first quarter of 2023. And our average Medicaid rates over the same time period increased 5.3% due to state reimbursement increases and our participation in supplemental Medicaid payment and quality improvement programs. Both increases come from our efforts to keep healthcare local by recognizing and serving patients' acuity needs locally. This also allows us to properly meet the continuing shift of higher acuity patients being discharged from acute care settings into skilled nursing facilities. Outlook for continued growth remains strong with a robust acquisition pipeline and continued improvement both clinically and financially in the operations we've recently acquired.

81.    During the Q124 Earnings Call, Defendant Apt also highlighted the Company's revenue growth, stating, in relevant part:

> We had $934.7 million of revenue for the three months ended March 31st, 2024, a 31.9% increase over prior year period. . . .
>
> We attribute our revenue growth to the adding 5,194 beds to the company over the past year, which represents 35.3% increase in patient days. Additionally, we realized a meaningful improvement on our revenue per patient day over the same time period. We continued the growth of our overall bed count into the first quarter of this year with adding 10 new operations. our local teams have been making clinical improvements, which is leading to increased occupancy and stabilization of the financial performance of these facilities. Additionally, our average Medicare revenue per patient day remained strong through Q1 at both our ramping and mature facilities at $969 and $938, respectively, compared to 23, where our average Medicare revenue per patient day at ramping and mature was $836 and $846,

respectively.

82.    On August 12, 2024, the Company issued a press release announcing its financial results for the second quarter of 2024 (the "2Q24 Earnings Release"). In the 2Q24 Earnings Release, the Company reported consolidated GAAP revenue of $981.8 million for the second quarter, an increase of 29% from the second quarter of 2023. The 2Q24 Earnings Release also reported that full year 2024 revenue guidance was increasing, with revenue expected to be in the range of $3.85 billion to $3.95 billion for the year.

83.    The 2Q24 Earnings Release also highlighted the Company's work in the Medicare and Medicaid programs and the Company's SNF business:

- Average Medicare and Medicaid daily rates increased 9.5% and 3.5%, respectively, for the second quarter of 2024, as compared to the same quarter of the prior year.

- In the second quarter of 2024 the Company added 2 operating facilities, including 167 skilled nursing beds, respectively.

84.    In the 2Q24 Earnings Release, Defendant Murray was quoted as stating:

We had another strong quarter, again highlighted by 165 of our facilities having a 4 or 5 star CMS Quality Measures rating. We believe this is a key driver of our revenue growth in the second quarter of 2024 of 29.1% or $221.2 million as compared to the second quarter of 2023.

85.    The 2Q24 Earnings Release also included a statement from Defendant Apt on the Company's revenue growth:

Our revenue growth was also driven in significant part by our adding 3,947 operational beds to the company over the twelve months ending June 30, 2024, leading to a 24.8% increase in patient days for the second quarter of 2024 compared to the same quarter of the prior year. Additionally, our occupancy remained strong across all facilities — 91.0% in the second quarter of 2024.

86.    On the same day, the Company filed its quarterly report for the period ended June 30, 2024 on a Form 10-Q with the SEC (the "2Q24 10-Q"). The 2Q24 10-Q contained the same

28

financial information as the 2Q24 Earnings Release. *See* ¶ 82. The 2Q24 10-Q also contained substantially the same false and misleading statements regarding the Company's risks, compliance measures, and licensure and certification requirements as the IPO Prospectus as detailed in ¶¶ 64-66, 71.

87.    The 2Q24 10-Q also reported that revenue from the Medicaid and Medicare programs amounted to 38.1% and 38.4% of the Company's condensed combined/consolidated net patient and resident revenue for the second quarter of 2024, respectively.

88.    Additionally, the 2Q24 10-Q highlighted the Company's patient and service revenue and skilled nursing services revenue for the quarter, stating, in relevant part

> <u>Patient and resident service revenue</u> - Patient and resident service revenue increased by $221.0 million to $981.4 million for the three months ended June 30, 2024, a 29.1% increase compared to the three months ended June 30, 2023. For the three months ended June 30, 2024 and 2023, skilled nursing services revenue represented more than 99.0% of patient and resident service revenue.
>
> Skilled nursing services revenue increased by 28.7%, or $217.1 million, to $973.1 million for the three months ended June 30, 2024, compared to the three months ended June 30, 2023. This change was driven by an increase in operational beds of 3,947 from June 30, 2023 to June 30, 2024 leading to a 24.8% increase in patient days year-over-year. Additionally, we experienced consistently high occupancy across all facilities of 91.0% for the three months ended June 30, 2024, a slight decrease as compared to 91.5% for the three months ended June 30, 2023. The decrease in occupancy across all facilities can be attributed to our New facilities only being 84.2% occupied for the three months ended June 30, 2024 compared to 88.3% for the three months ended June 30, 2023.
>
> Our skilled nursing services revenue was impacted by developments in our average daily rates and fluctuations in our payor sources. Our average Medicare daily rates increased by 9.5%, for the three months ended June 30, 2024, compared to the three months ended June 30, 2023.
>
> Our average Medicaid rates increased 3.5% due to state reimbursement increases and our participation in supplemental Medicaid payment programs and quality improvement programs in various states. Medicaid rates exclude the amount of state relief revenue we recorded.

89.    The 2Q24 10-Q was signed by Defendants Murray and Apt and was accompanied

by SOX Certifications signed by Defendants Murray and Apt, wherein they attested to the accuracy of the 2Q24 10-Q.

90.    Also on August 12, 2024, the Company held an earnings call for investors and analysts to discuss the financial results for the second quarter of 2024 (the "2Q24 Earnings Call"). During the 2Q24 Earnings Call, Defendant Apt highlighted the Company's sustained growth, stating, in relevant part:

> The occupancy has not seen a cyclical seasonal drop that we did most summers. The occupancies remain strong. The skilled mix is [sic] hung in there. And most importantly, our revenue per patient day continues to grow with capturing the acuity mix across the patient population. So really the EBITDA uptick is driven from that.

91.    Additionally, during the 2Q24 Earnings Call, Defendant Murray highlighted the Company's revenue growth and financial strength, stating that "[t]he improvement of clinical outcomes is truly the most important factor in our financial strength" and that the "[o]utlook for continued growth remains strong with a robust acquisition pipeline and continued improvements both clinically and financially in the operations we've recently acquired."

92.    On September 3, 2024, the Company filed a Registration Statement on a Form S-1 with the SEC in connection with the SPO (the "SPO Registration Statement," and together with the SPO Prospectus, the "SPO Materials"). The SPO Registration Statement reported on the Company's financial results for the years 2021 through 2023 and the financial results for the six months ended June 30, 2024:

30

| | Year Ended December 31, | | | Six Months Ended June 30, | |
|---|---|---|---|---|---|
| | 2023 | 2022 | 2021 | 2024 | 2023 |
| | | | | (unaudited) | |
| | (in thousands, except share and per share data) | | | | |
| **Revenue** | | | | | |
| Patient and resident service revenue | $ 3,110,114 | $ 2,399,155 | $ 1,135,909 | $ 1,915,696 | $ 1,468,250 |
| Additional funding | $ 375 | $ 21,482 | $ 28,563 | $ — | $ 375 |
| Other revenues | $ 1,003 | $ 1,357 | $ 2,091 | $ 871 | $ 481 |
| Total Revenue | $ 3,111,492 | $ 2,421,994 | $ 1,166,563 | $ 1,916,567 | $ 1,469,106 |
| **Expenses** | | | | | |
| Cost of services | $ 2,447,713 | $ 1,861,314 | $ 901,095 | $ 1,498,139 | $ 1,129,587 |
| Rent-cost of services | $ 216,711 | $ 160,003 | $ 78,122 | $ 129,794 | $ 96,560 |
| General and administrative expense | $ 213,664 | $ 149,006 | $ 96,834 | $ 191,286 | $ 122,137 |
| Depreciation and amortization | $ 25,632 | $ 22,311 | $ 7,153 | $ 16,678 | $ 11,988 |
| Total Operating Expenses | $ 2,903,720 | $ 2,192,634 | $ 1,083,204 | $ 1,835,897 | $ 1,360,272 |
| Operating Income | $ 207,772 | $ 229,360 | $ 83,359 | $ 80,670 | $ 108,834 |
| **Other (expense) income** | | | | | |
| Interest expense | $ (49,919) | $ (25,538) | $ (5,278) | $ (24,578) | $ (25,942) |
| Gain on lease termination | $ — | $ — | $ — | $ 8,046 | $ — |
| Other (expense) income, net | $ (536) | $ 3,223 | $ 3,345 | $ (3,465) | $ (2,203) |
| Total Other Expense, net | $ (50,455) | $ (22,315) | $ (1,933) | $ (19,997) | $ (28,145) |
| Income before provision for income taxes | $ 157,317 | $ 207,045 | $ 81,426 | $ 60,673 | $ 80,689 |
| Provision for income taxes | $ (44,435) | $ (56,549) | $ (33,479) | $ (22,441) | $ (21,871) |
| Net income | $ 112,882 | $ 150,496 | $ 47,947 | $ 38,232 | $ 58,818 |
| **Less:** | | | | | |
| Net income attributable to noncontrolling interest | $ 8 | $ — | $ — | $ 4 | $ 3 |
| Net income attributable to PACS Group, Inc. | $ 112,874 | $ 150,496 | $ 47,947 | $ 38,228 | $ 58,815 |
| **Net income per share attributable to PACS Group, Inc.** | | | | | |
| Basic | $ 0.88 | $ 1.17 | $ 0.37 | $ 0.27 | $ 0.46 |
| Diluted | $ 0.88 | $ 1.17 | $ 0.37 | $ 0.27 | $ 0.46 |
| **Weighted-average common shares outstanding** | | | | | |
| Basic | 128,723,386 | 128,723,386 | 128,723,386 | 139,093,520 | 128,723,386 |
| Diluted | 128,723,386 | 128,723,386 | 128,723,386 | 139,684,618 | 128,723,386 |

| | Year Ended December 31, | | | Six Months Ended June 30, | |
|---|---|---|---|---|---|
| | 2023 | 2022 | 2021 | 2024 | 2023 |
| | (Dollars in thousands) | | | | |
| **Key Skilled Services Metrics** | | | | | |
| Skilled nursing services revenue | $ 3,092,577 | $ 2,391,309 | $ 1,133,103 | $ 1,900,538 | $ 1,461,568 |
| Skilled mix by revenue | 55.1 % | 64.1 % | 57.8 % | 51.6 % | 60.8 % |
| Skilled mix by nursing patient days | 32.4 % | 40.7 % | 34.5 % | 29.5 % | 37.3 % |
| **Occupancy for skilled nursing services:** | | | | | |
| Available patient days | 7,457,345 | 5,719,689 | 3,106,602 | 4,389,269 | 3,359,730 |
| Actual patient days | 6,775,063 | 5,139,736 | 2,681,927 | 3,994,467 | 3,078,280 |
| Occupancy rate (operational beds) | 90.9 % | 89.9 % | 86.3 % | 91.0 % | 91.6 % |
| Number of facilities at period end | 203 | 150 | 138 | 214 | 185 |
| Number of operational beds at period end | 22,950 | 16,345 | 14,841 | 24,483 | 20,536 |
| **Non-GAAP Financial Measures** | | | | | |
| *Performance Measures* | | | | | |
| EBITDA(1) | $ 232,860 | $ 254,894 | $ 93,857 | $ 101,925 | $ 118,616 |
| Adjusted EBITDA(1) | $ 237,486 | $ 255,516 | $ 104,073 | $ 188,243 | $ 122,433 |
| *Valuation Measure* | | | | | |
| Adjusted EBITDAR(1) | $ 454,197 | | | $ 318,037 | |

93.    Additionally, the SPO Registration touted the Company's compliance efforts, stating, in relevant part:

***We review and audit the care delivery, recordkeeping and billing processes of our operating subsidiaries. These reviews from time to time detect instances of noncompliance that we attempt to correct, which in some instances requires reduced or repayment of billed amounts or other costs.***

We have internal compliance professionals and invest in other resources to help us comply with various requirements of federal and private healthcare programs. Our compliance program includes, among other things, (1) policies and procedures that take into account applicable laws, regulations, sub-regulatory guidance and industry practices and customs that govern the clinical, reimbursement and operational aspects of our operating subsidiaries; (2) training about our compliance process for employees throughout our organization, our directors and officers, and training about Medicare and Medicaid laws, fraud and abuse prevention, clinical standards and practices, and claim submission and reimbursement policies and procedures for appropriate employees; and (3) internal controls that monitor, among other things, the accuracy of claims, reimbursement submissions, cost reports and source documents, provision of patient care, services, and supplies as required by applicable standards and laws, accuracy of clinical assessment and treatment documentation, and implementation of judicial and regulatory requirements (i.e., background checks, licensing and training).

While we have not experienced any material compliance issues to date, from time to time, our systems and internal controls highlight potential compliance issues, which we investigate as they arise. We similarly investigate concerns that are reported to us by employees or other persons. When errors or compliance failures are identified, we seek to rectify them as appropriate.

94.    On September 6, 2024, the Company filed the "SPO Prospectus. The SPO Prospectus included the substantially the same false and misleading risk factors as the IPO Prospectus detailed in ¶ 66.

95.    Additionally, the SPO Prospectus included numerous false and misleading statements regarding the Company's purported regulatory compliance, stating, in relevant part:

We operate in a highly regulated industry with stringent regulatory compliance obligations, which requires robust regulatory compliance operations. Failure to operate in compliance with applicable laws and regulations could require significant expenditures and result in regulatory deficiencies and other regulatory penalties. PACS Services functions to support our regulatory compliance obligations across our organization, including through controlled billing and cost reporting practices and legal, risk management, and compliance support. . . .

***Robust culture of compliance.*** We focus on instilling a unified, cohesive culture of

innovation and compliance that we believe provides consistency in our results and confidence in our facilities as an attractive care option for patients. Our rigorous approach to billing integrity, our independent internal compliance function, and our regular facility billing audits are intended to provide a foundation of trust and collaboration that makes us a natural choice for payors. . . .

### *Regulatory Environment*

The SNF industry is highly regulated with stringent regulatory compliance obligations. In the ordinary course of business, providers are subject to federal, state and local laws and regulations relating to, among other things, billing and reimbursement, relationships with vendors, business relationships with physicians and other healthcare providers and facilities, as well as licensure, accreditation, enrollment, quality, adequacy of care, physical plant, life safety, personnel, staffing and operating requirements. Changes in law or new interpretations of existing laws and regulations may have a significant impact on revenue, costs and business operations of providers and other industry participants. In addition, governmental and other authorities periodically inspect the SNFs, senior living facilities and outpatient rehabilitation agencies to verify continued compliance with applicable regulations and standards and may impose citations and other regulatory penalties for regulatory deficiencies. Such regulatory penalties include but are not limited to civil monetary penalties, temporary payment bans, suspension or revocation of a state operating license and loss of certification as a provider in the Medicare or Medicaid program, which may be temporary or permanent in nature. This regulatory environment and related enforcement can have an adverse effect on providers and other industry participants. . . .

We operate in a highly regulated industry with stringent regulatory compliance obligations, and are subject to extensive and complex laws and government regulations. If we are not operating in compliance with these laws and regulations or if these laws and regulations change, we could be required to make significant expenditures or change our operations in order to bring our facilities and operations into compliance. . . .

We have internal compliance professionals and invest in other resources to help us comply with various requirements of federal and private healthcare programs. Our compliance program includes, among other things, (1) policies and procedures that take into account applicable laws, regulations, sub-regulatory guidance and industry practices and customs that govern the clinical, reimbursement and operational aspects of our operating subsidiaries; (2) training about our compliance process for employees throughout our organization, our directors and officers, and training about Medicare and Medicaid laws, fraud and abuse prevention, clinical standards and practices, and claim submission and reimbursement policies and procedures for appropriate employees; and (3) internal controls that monitor, among other things, the accuracy of claims, reimbursement submissions, cost reports and source documents, provision of patient care, services, and supplies as

required by applicable standards and laws, accuracy of clinical assessment and treatment documentation, and implementation of judicial and regulatory requirements (i.e., background checks, licensing and training).

While we have not experienced any material compliance issues to date, from time to time, our systems and internal controls highlight potential compliance issues, which we investigate as they arise. We similarly investigate concerns that are reported to us by employees or other persons. When errors or compliance failures are identified, we seek to rectify them as appropriate. Depending on the circumstances, in order to rectify a failure, we may be required to take certain actions, including but not limited to self-reporting them to applicable federal and state regulators, government agencies or other third parties, disgorging or paying money to the government or other third parties, and implementing changes to systems, personnel or other resources in order to mitigate the risk of recurrence, all of which could result in significant costs. Such issues, and any failure to properly remediate such issues or to timely identify and refund overpayments, for instance, could result in potential federal False Claims Act (FCA) liability and could have a material adverse effect on our business, financial condition and results of operations. Other significant compliance failures could have similar negative impacts.

96.    The SPO Prospectus also touted the Company's ability to continue to grow and sustain its growth, stating that the Company has "built a multi-faceted growth strategy with multiple organic and inorganic levers to help drive our growth and capitalize on the favorable industry dynamics" and that the Company's portfolio "has a healthy foundation for strong embedded organic growth."

97.    Additionally, the SPO Prospectus contained positive statements on the Company's financials, stating, in relevant part:

For the six months ended June 30, 2024 and 2023, we generated total revenue of $1.9 billion and $1.5 billion, respectively. A substantial portion of our revenue is generated from payments from third-party payors, including Medicare and Medicaid, which represent our largest sources of revenue and accounted for 36.6% and 38.4% of our total revenue for the six months ended June 30, 2024, respectively, and 44.8% and 32.9% of our total revenue for the six months ended June 30, 2023, respectively. For the six months ended June 30, 2024, we generated total net income of $38.2 million, total operating expense of $1.8 billion and Adjusted EBITDA of $188.2 million. For the six months ended June 30, 2023, we generated total net income of $58.8 million, total operating expense of $1.4 billion and Adjusted EBITDA of $122.4 million. For the year ended December 31, 2023,

we generated total revenue of $3.1 billion, and Medicare and Medicaid accounted for 38.6% and 37.6% of our total revenue, respectively. For the year ended December 31, 2022, we generated total revenue of $2.4 billion, and Medicare and Medicaid accounted for 47.6% and 30.2% of our total revenue, respectively. For the year ended December 31, 2023, we generated total net income of $112.9 million, total operating expense of $2.9 billion and Adjusted EBITDA of $237.5 million. For the year ended December 31, 2022, our total operating expenses were $2.2 billion, and we generated net income of $150.5 million and Adjusted EBITDA of $255.5 million.

98.    The above statements were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, the Individual Defendants failed to disclose to investors, *inter alia*, that: (a) PACS Group engaged in a scheme to submit false Medicare claims; (b) these false Medicare claims drove more than 100% of the Company's operating and net income between 2020 and 2023; (c) PACS Group engaged in a scheme to bill thousands of unnecessary respiratory and sensory therapies to Medicare recipients; (d) PACS Group engaged in a scheme to falsify documentation related to licensure and staffing at its facilities; and (e) as a result of the foregoing, the Company's public statements regarding its business, operations, financials, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

**The Truth is Revealed**

99.    The truth began to emerge on November 4, 2024, when *Hindenburg Research* published a report titled "PACS Group: How To Become A Billionaire In the Skilled Nursing Industry By Systemically Scamming Taxpayers." The report, which was based on a five-month investigation that included interviews with eighteen former PACS Group employees and competitors, and an analysis of more than 900 PACS Group facility cost reports, revealed that PACS Group engaged in several unlawful and/or unethical practices. Specifically, the report included the following allegations against PACS Group, among others:

- In one key example, PACS abused a COVID-era waiver, inappropriately accessing skilled care Medicare benefits for thousands of patients across its national portfolio of facilities, according to our investigation.

- We estimate the scheme drove more than 100% of PACS' operating and net income from 2020 – 2023, enabling PACS to IPO in early 2024 with the illusion of legitimate growth and profitability. . . .

- Following the waiver scheme, PACS' Medicare skilled care revenue declined sharply in 2H 2023. But it rebounded in 1H 2024, according to PACS' financial statements. Former employees described a "new trick" to get back to "COVID level profitability" involving billing thousands of unnecessary respiratory and sensory integration therapies to Medicare Part B regardless of clinical need or outcomes. . . .

- Former employees also detailed another scheme whereby PACS attempts to fool regulators by "renting" licenses from third parties to "hang" on buildings. It then either employs unlicensed administrators or has administrators manage multiple buildings in excess of state mandated limits. . . .

- A former manager also detailed a documentation practice whereby PACS would retroactively add fake RN hours "across the board" in another apparent scheme to meet minimum staffing requirements, boost star ratings, and avoid costly penalties.

100.    The report went on to provide more detail on each of these allegations, stating, in relevant part:

**Part 1: PACS' Growth From 2020 To 2023 Was Driven By A COVID-Era Medicare Billing Scheme That Drove More Than 100% Of PACS' Operating And Net Income During The Period, Per Our Estimates**. . . .

Evidence shows the most aggressive of these practices was a management-driven, company-wide scheme to defraud Medicare through the COVID emergency, evidenced by anomalies in PACS' Medicare revenue, and corroborated by more than a dozen former PACS employees, ranging from frontline clinical staff to regional managers.

We believe this scheme funded PACS' aggressive acquisition strategy throughout COVID and drove substantially all of its earnings from early 2020 to the end of 2023, giving investors the illusion of legitimate growth and profitability leading into its IPO. . . .

**Background: SNFs Make 3x More Revenue From Short-Term Patients That**

**Can Access Medicare Benefits Than From Long-Term Medicaid Patients, According To A Former PACS Administrator**

**Historically, The More Profitable Medicare Rates Can Generally Only Be Temporarily Accessed After A Qualifying 3-Day Hospital Stay, Per Medicare Regulations**. . . .

**From March 2020 to May 2023, CMS Provided A COVID Emergency Waiver That Allowed SNFs To Access Patients' Higher-Paying Medicare Benefits Without The 3-Day Hospital Stay, But COVID Itself Was Not A Qualifying Condition**. . . .

During our research, we conducted in-depth interviews with 18 former PACS employees who had worked in clinical, compliance, and human resources departments. Former employees detailed how PACS engaged in a multi-year, nationwide scheme to use the COVID waiver to "flip" patients from Medicaid to Medicare based on COVID exposure, roughly tripling per-patient revenue, even though the great majority of these patients didn't need Medicare-covered skilled nursing care.

**Former PACS Employees Said The Company Would Use A Single Positive COVID Test As Justification To "Flip" Entire Patient Populations To Medicare Coverage Under The COVID Waiver**

**"…As Soon As One Person Tested [Covid-19] Positive In Our Building, Boom, Wildfire, Every Single Person Gets Flipped [To Medicare], Absolutely Inappropriately…" – Former PACS Regional Manager**. . . .

However, after the COVID waiver expired, PACS' quarterly Medicare revenue declined suddenly and without explanation from a reported peak of ~$340 million in Q1 2023 to an estimated $271 million in Q4 2023— a decline that investors would miss if they only looked at full year revenue.

When accounting for and removing the impact of newly acquired facilities, the fall-off in Medicare revenue was an estimated ~$90 million per quarter, equivalent to ~$360 million in annualized revenue. . . .

**Part 2: PACS' "New Trick" To Maintain Growth Post-COVID Is Abusing Yet Another Medicare Program**

With the expiration of the COVID waiver in 2023 and a sudden decline in Medicare revenue, PACS was faced with the challenge of maintaining reported growth and profitability as the company would have to contend with Wall Street's high post-IPO expectations.

PACS appears to have met this challenge, as evidenced by the sharp recovery of its

Medicare revenue in early 2024, which reached an all-time high in Q2 2024, according to PACS' disclosures, public facility-level financial reports and our own calculations.

Using costs provided by former PACS administrators, we estimate the program has 80%+ margins and contributed the substantial majority of PACS' Q2 adjusted EBITDA of $99.7 million. . . .

A former PACS administrator from California explained that the scheme involves billing respiratory and sensory integration therapies to Medicare Part B, even when these therapies aren't applicable to patients. . . .

According to the former administrator, the widespread implementation of respiratory therapy programs, among other Part B programs, was a way to "cover up" a loss of net operating income from the COVID waiver. . . .

**Part 3 – PACS Hired An Army Of Inexperienced Staff And Incentivized Them To Commit A Series Of Billing And Staffing Violations**

**Former PACS Employees Say The Company Allowed Unlicensed Individuals To Run Entire Facilities, While PACS "Rents" A License From Someone Else To "Hang" On The Building In An Apparent Effort To Fool Regulators**

In California, SNF administrators must be licensed and are not allowed to manage more than 200 beds, which can be spread across a maximum of 3 facilities.

A former administrator described how PACS places unlicensed individuals in administrator positions, while paying retired administrators ~$3,000 a month to "hang" their licenses on the facilities, despite them not working at that facility, or for PACS in any capacity:

*"... a lot of the times they were putting guys in the buildings that weren't even licensed. So they were running buildings without being licensed, and they would just hang a license until that guy did have one... I mean, **I had a buddy that wasn't even working in the industry, and PACS paid him to hang a license on a building. I think they paid him like $3,000 a month to hang his license...** I think the Regional [Vice President] Venmo'd him."*

A second former administrator corroborated this practice, saying that PACS will simply use someone else's license for a facility, despite that person not actively working at the facility . . .

**Part IV: The Reality Of PACS' Star Ratings**. . . .

**California SNFs Must Hire A Sufficient Number Of Certified Nurse Assistants (CNAs) To Increase Their CMS Quality Ratings, And To Qualify For State**

**Bonus Programs**

**A Former Senior Employee Told Us That PACS Secretly Employs Uncertified Nurse Aides ("NAs"), Which Are Listed In The "System" As Certified, In An Apparent Scheme To Cheat Staffing Ratios**

**"Maybe 1/3 Of Their Buildings, If Not More, Had These NAs Listed As CNAs" – Former PACS Employee**. . . .

As of Q2 2024, PACS claims in its SEC filings to have employed approximately 12,633 CNAs across its network of 220 facilities. But a former senior level employee told us that for over 2 years during COVID, PACS had Nurses Aids ("NAs") in its system as CNAs, in an apparent effort to circumvent minimum staffing requirements while simultaneously lowering costs and boosting bonuses:

*"… they would manipulate those numbers because the NAs you can pay less, so they would have more NAs on the floor than the CNAs. But they would have them in the system as a CNA, even though they didn't actually have their CNA certification. But then they could count them as a CNA… **they'd been working for 2 years under a license that wasn't there, and they were billing according to staffing which was inaccurate.**"*

*"I would say it was probably happening at most of their original 57 buildings… I'm not sure how long it was happening, but my assumption is that they were doing it during all of COVID, because they could… I do know that probably, maybe **1/3 of their buildings, if not more, had these NAs listed as CNAs**…There's no reason to put someone into the system as having an actual license unless they have an actual license, unless you're trying to cheat your staffing ratios."*

**Former Employees Claim That PACS Retroactively Adds In Fake RN Hours In Another Apparent Effort To Meet Minimum Staffing Requirements And Boost Star Ratings**

**Former Employee: "Not Only Were They Billing For Hours That Weren't Actually Worked, They Also Were Advertising That They Were A Higher Star Rated Building … When They Technically Weren't, Because They Manipulated Their Staffing To Be A Higher Star"**

101.    On this news, the Company's stock price fell $11.93 per share, or approximately 28%, to close at $31.01 per share on November 4, 2024.

102.    On November 6, 2024, the truth fully emerged when PACS Group issued a press release announcing that it was postponing the filing of its third quarter 2024 earnings release. In

the press release, Defendant Murray discussed the *Hindenburg Research* report and revealed that the Company received civil investigative demands from the federal government, stating, in relevant part:

> We believe recent third-party allegations are misleading. However, in line with our commitment to holding ourselves to a high standard – in how we serve our patients, operate our business, and engage with stakeholders – the Company's Audit Committee, with assistance from external counsel, is conducting an investigation of the allegations. Given the industry we operate in, we're subject to various governmental surveys and payment audits in the ordinary course of business and are proud of our compliance track record. ***We've received civil investigative demands from the federal government regarding the Company's reimbursement and referral practices that may or may not be related to this week's third-party report.*** We take these types of allegations seriously and will continue to cooperate with the government.

(Emphasis added).

103.    On this news, the Company's stock price fell $11.45 per share, or approximately 39%, to close at $18.09 per share on November 6, 2024

### Harm to the Company

104.    As a direct and proximate result of the Individual Defendants' misconduct, PACS Group has lost and expended, and will lose and expend, millions of dollars.

105.    Such expenditures include, but are not limited to, the legal fees associated with the Securities Class Actions filed against the Company and the Individual Defendants, and amounts paid to outside lawyers, accountants, and investigators in connection therewith.

106.    Such expenditures also include, but are not limited to, significant compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

107.    Furthermore, the Securities Class Actions have exposed the Company to massive class-wide liability.

108.    Individual Defendants' misconduct has also exposed the Company to potential

liability relating to civil investigative demands from the federal government.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

109.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by the Individual Defendants.

110.    Plaintiff will adequately and fairly represent the interests of PACS Group and its shareholders in enforcing and prosecuting its rights.

111.    PACS Group is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

112.    Plaintiff is a current shareholder of PACS Group and was a continuous shareholder of the Company during the period of the Individual Defendants' wrongdoing alleged herein. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

113.    A pre-suit demand on the Board of PACS Group is futile and, therefore, excused. At the time this action was commenced, the five-person Board consisted of Individual Defendants Murray, Hancock, Millard, Leavitt, and Dilsaver (the "Director Defendants").  As set forth below, all of the Director Defendants are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action because they face a substantial likelihood of liability for the misconduct alleged herein. Therefore, demand on the Board to institute this action is not necessary because such a demand would have been a futile and useless act.

114.    The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

115.    Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

116.    Each of the Individual Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

117.    As members of the Board charged with overseeing the Company's affairs, each of the Director Defendants had knowledge, or the fiduciary obligation to inform themselves, of information pertaining to the Company's core operations and the material events giving rise to these claims.  Specifically, as Board members of PACS Group, the Director Defendants knew, or should have known, the material facts surrounding PACS Group's financial condition and internal control mechanisms.

118.    Defendant Murray is not disinterested or independent. Defendant Murray is a co-founder of the Company and serves as CEO of the Company and as Chairman of the Board. Defendant Murray also owns, in concert with Defendant Hancock, approximately 85.7% of the voting power of PACS Group common stock. Furthermore, Defendant Murray is also named as a defendant in the Securities Class Actions, and as such, faces a substantial likelihood of liability for the misconduct alleged therein. Thus, the Company admits that Defendant Murray is a non-independent director.

119.    Defendant Hancock is not disinterested or independent. Defendant Hancock is a

co-founder of the Company and serves as Executive Chairman of the Board. Defendant Hancock previously served as CFO of the Company and, in connection with Defendant Murray, owns approximately 85.7% of the voting power of PACS Group common stock. Defendant Hancock is also named as a defendant in the Securities Class Actions, and as such, faces a substantial likelihood of liability for the misconduct alleged therein. Thus, Defendant Hancock is a non-independent director.

120.    Moreover, Defendant Murray signed the 1Q24 10-Q and 2Q24 10-Q and signed the SOX Certifications that accompanied the 1Q24 10-Q and 2Q24 10-Q. Accordingly, Defendant Murray breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile, and, therefore, excused.

121.    Additionally, Defendants Murray, Hancock, Millard, and Leavitt are named as defendants in the *Manchin* Action and Defendants Murray, Hancock, Millard, Leavitt, and Dilsaver are named as defendants in the *New Orleans* Action. As such, each of the Director Defendants faces a substantial likelihood of liability for the misconduct alleged therein.

122.    Furthermore, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

123.    Moreover, the Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

124.    The Director Defendants took no action to redress the harm suffered by the Company resulting from the misconduct alleged herein.

125.    Defendants Millard, Leavitt, and Dilsaver (the "Audit Defendants") serve on the Company's Audit Committee, and pursuant to the Audit Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, financial reporting and the underlying internal controls and procedures over financial reporting.  At all relevant times, however, the Audit Defendants breached their fiduciary duty to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the Company's business, finances, and operations, as alleged above.  Therefore, the Audit Defendants cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihoods.

126.    The Director Defendants, as members of the Board, were and are subject to the Company's Code of Conduct.  The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Director Defendants to also adhere to the Company's standards of business conduct.  The Director Defendants violated the Code of Conduct because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

127.    Accordingly, a pre-suit demand on the Board is futile and excused.

## COUNT I
### Against the Individual Defendants
### For Breach of Fiduciary Duty

128.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

129.    The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

130.    Each of the Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, good faith, loyalty, oversight, and supervision.

131.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures, and otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

132.    Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (a) PACS Group engaged in a scheme to submit false Medicare claims; (b) these false Medicare claims drove more than 100% of the Company's operating and net income between 2020 and 2023; (c) PACS Group engaged in a scheme to bill thousands of unnecessary

respiratory and sensory therapies to Medicare recipients; (d) PACS Group engaged in a scheme to falsify documentation related to licensure and staffing at its facilities; and (e) as a result of the foregoing, the Company's public statements regarding its business, operations, financials, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

133.    The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

134.    In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and omissions of material fact referenced herein.

135.    As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

136.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Actions, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Actions, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

137.    Plaintiff, on behalf of PACS Group, has no adequate remedy at law.

### COUNT II
**Against the Individual Defendants for Aiding and
Abetting Breach of Fiduciary Duty**

138.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

139.    By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breaches of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

140.    Plaintiff on behalf of PACS Group has no adequate remedy at law.

### COUNT III
**Against the Individual Defendants for Unjust Enrichment**

141.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

142.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, PACS Group.

143.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from PACS Group that was tied to the performance or artificially inflated valuation of PACS Group, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

144.    Plaintiff, as a shareholder and a representative of PACS Group, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits

and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

145.    Plaintiff on behalf of PACS Group has no adequate remedy at law.

**COUNT IV**
**Against the Individual Defendants for Waste of Corporate Assets**

146.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

147.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue.  It resulted in continuous, connected, and ongoing harm to the Company.

148.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying and colleting excessive compensation and bonuses; and (ii) incurring potentially millions of dollars of legal liability and/or legal costs, including defending against the Securities Class Action.

149.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

150.    Plaintiff, on behalf PACS Group, has no adequate remedy at law.

**COUNT V**
**Against Defendants Murray, Apt, Hancock, Millard, Leavitt, and Dilsaver**
**for Contribution Under Sections 10(b) and 21D of the Exchange Act**

151.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

152.    PACS Group and Defendants Murray, Apt, Hancock, Millard, Leavitt, and Dilsaver are named as defendants in the Securities Class Actions, which assert claims under federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and Rule 10b-5

48

promulgated thereunder by the SEC. If and when the Company is found liable in the Securities Class Actions for these violations of the federal securities laws, the Company's liability will be in whole, or in part, due to Defendants Murray's, Apt's, Hancock's, Leavitt's, and Dilsaver's willful and/or reckless violations of their obligations as officers and/or directors of PACS Group.

153.    Defendants Murray, Apt, Hancock, Millard, Leavitt, and Dilsaver, because of their positions of control and authority as officers and/or directors of PACS Group, were able to, and did, directly and/or indirectly, exercise control over the business and corporate affairs of PACS Group, including the wrongful acts complained of herein and in the Securities Class Actions.

154.    Accordingly, Defendants Murray, Apt, Hancock, Millard, Leavitt, and Dilsaver are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

155.    As such, PACS Group is entitled to receive all appropriate contribution or indemnification from Defendants Murray, Apt, Hancock, Millard, Leavitt, and Dilsaver.

156.    Plaintiff, on behalf PACS Group, has no adequate remedy at law.

<u>**COUNT VI**</u>
**Against Defendants Murray, Apt, Hancock, Millard,**
**Leavitt, and Dilsaver for Contribution Under Section 11(f)**
**of the Securities Act and Section 21D of the Exchange Act**

157.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

158.    As a result of the misconduct alleged above, the Company is a defendant in the Securities Class Actions, in which it is a joint tortfeasor in claims brought under Sections 11 and 15 of the Securities Act.

159.    Federal law provides PACS Group with a cause of action against other alleged joint

tortfeasors under Section 11(f) of the Securities Act.

160.    The plaintiffs in the Securities Class Actions allege that the IPO Materials and SPO Materials, filed with the SEC in connection with its IPO and SPO, contained numerous untrue statements of material facts and omitted to state material facts necessary to make the statements not misleading.

161.    PACS Group is the registrant for the IPO and the SPO, and the Individual Defendants named herein were responsible for the contents and dissemination of the IPO Materials and SPO Materials.

162.    As the issuer of the shares, PACS Group is strictly liable to the plaintiffs in the Securities Class Actions for the misstatements and omissions alleged therein.

163.    The plaintiffs in the Securities Class Actions allege that none of the defendants named therein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the IPO Materials and SPO Materials were true and not misleading.

164.    The Individual Defendants, because of their positions of control and authority as officers and directors of PACS Group, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of PACS Group, including the wrongful acts complained of herein and in the Securities Class Actions.

165.    Accordingly, the Individual Defendants are liable pursuant to Section 11(f) of the Securities Act (15 U.S.C. § 77k(f)(1)) which creates a private right of action for contribution, and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)) which governs the application of a private right of action for contribution arising out of violations of the Securities Act.

166.    As such, PACS Group is entitled to receive all appropriate contribution or indemnification from the Individual Defendants.

167.    Plaintiff, on behalf PACS Group, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B.    Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C.    Awarding punitive damages;

D.    Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all claims set forth herein.

DATED: February 14, 2025                    **RIGRODSKY LAW, P.A.**

                                By:  _/s/ Timothy J. MacFall_
                                     Seth D. Rigrodsky
                                     Timothy J. MacFall
                                     Vincent A. Licata
                                     Leah B. Wihtelin
                                     825 East Gate Boulevard, Suite 300
                                     Garden City, NY 11530
                                     Telephone: (516) 683-3516
                                     Email: sdr@rl-legal.com
                                     Email: tjm@rl-legal.com

`

Email: vl@rl-legal.com
Email: lw@rl-legal.com

*Attorneys for Plaintiff*

**OF COUNSEL:**

**GRABAR LAW OFFICE**
Joshua H. Grabar
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (267) 507-6085
Email: jgrabar@grabarlaw.com